United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAYMOND E. LOPEZ,

       Petitioner,

    v.

DAVE DAVEY,

       Respondent.

Case No.  13-cv-4879-TEH

ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS; DENYING
CERTIFICATE OF APPEALABILITY

Raymond Lopez, a state prisoner, has filed this pro se petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. Respondent was ordered to show cause why the petition should not be granted.  Respondent has filed an answer.  For the reasons set forth below, the petition is DENIED.

I

Petitioner was convicted of crimes in three separate trials. The witness dissuasion and arson case and the jail stabbing case were consolidated into a single appeal.  The murder case was appealed separately and the Court denied the habeas petition in that case.  See Lopez v. Lewis, Case No. 13-cv-0649-TEH.  In this habeas petition, Petitioner only challenges the convictions for witness dissuasion and arson.

On August 12, 2009, a Santa Clara County jury found Petitioner guilty of two counts of attempting to dissuade a witness from reporting a crime and one count of arson of a car.

People v. Lopez, No. H035015, 2012 WL 1264451, at *1 (Cal. Ct. App. April 11, 2012).   The jury also found true the gang enhancement for each count.   Id.

Petitioner was sentenced to 7 years to life for the first witness dissuasion count, consecutive to 7 years to life on the second witness dissuasion count, consecutive to 7 years for the arson count.   Clerk's Transcript ("CT") Ex. A at 626.   The California Court of Appeal reversed one of the life-term gang enhancements for a witness dissuasion count.   Lopez, 2012 WL 1264451, at *1.   Petitioner was resentenced to a term of 7 years to life for one witness dissuasion count, consecutive to two years and four months for the second witness dissuasion count, consecutive to 7 years for the arson count.   Docket No. 15, Ex. M.

II

The following factual background is taken from the order of the California Court of Appeal.[1]

> Defendant was charged by second amended information with two counts of attempting to dissuade a victim or witness from reporting a crime (§ 136.1, subd. (b)(1); counts 1 & 2), and one count of arson (§ 451, subd. (d); count 3).   The information further alleged that all three counts were committed for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1) & (4).)
>
> 1. The Trial Evidence
> a. The Stabbing and Attempted Cover Up
> Crystal Lopez was defendant's girlfriend. Crystal invited her friends, Rosa C. and T.C., to visit her.   On May 4, 2007, Rosa

---

[1] This summary is presumed correct.   Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

drove her car, a Nissan Sentra, with T.C. to meet Crystal in San Jose. The three females, along with defendant and his friend named "Roach," then went driving in Rosa's car. Rosa and T.C. had previously met defendant. Roach drove, T.C. sat in the front passenger seat, and Rosa, Crystal, and defendant sat in the backseat. Rosa allowed Roach to drive her car because she was not familiar with San Jose.

Defendant and Roach were Norteños, and defendant was part of a "set or subclique of Nortenos" called "Roosevelt Park Locos." While the group was traveling in the car, Rosa allowed defendant to play a CD of "Norteno rap music." The "gang music" was playing "[r]eally loud" while all the windows were rolled down. The lyrics included references to the numbers 13 and 14 and to "scraps." A "scrap" is a "negative word" for a Sureño, and Sureños are a rival gang to Norteños. The music referred to "beating [scraps] up and killing them."

When the Nissan was stopped at a red light, a Ford Crown Victoria was nearby with two males in the front seat. Rosa saw the driver making hand gestures, which she characterized at trial as "gang signs." Rosa testified that she was not "real familiar with gangs," and that the driver was moving his hands "kind of like stereotypical of ... how you see it in the movies." No one in the Nissan was "really paying attention" to the gestures, except defendant, who stated, "Look at these ... fuckers" and/or "look at these fools." Defendant was "getting really fidgety" and was staring at the other car. Defendant told Crystal that the occupants of the car were "looking at him wrong."

According to Rosa, the driver of the Ford made "more gang signs" and defendant again indicated that he could not "believe what he's seeing." Rosa testified that defendant "thr[ew] up gestures" that were "similar to the ones" by the driver of the Ford. The driver of the Ford responded "with more gestures" and displayed a knife. Defendant was angry and was glaring at the occupants of the Ford.

Crystal testified that the occupants of the Ford "flipp[ed] ... off" defendant and also threw up three fingers, which was a gang sign

3

showing that they were Sureños.  According to Crystal, defendant flipped them off and called them "fucking scraps," but he did not respond with any gang sign.  He yelled "[f]uck you" and that they were "lucky" there were "girls in the car."  Crystal told defendant to "[q]uit staring" and "[l]et it go."  Defendant said "something about them being in a rival gang" and that "they are throwing up signs."

Once the cars were moving, the Ford tailgated the Nissan and also appeared to be trying to hit it.  Roach initially tried to get away from the Ford.  At some point, however, defendant stated to Roach words to the effect of "[c]ome on," "[l]et's go," or "[l]et's get them."  Defendant appeared "pumped up" and "ready to jump out of the car."  Roach stopped the car in the middle of a residential street.  Either before or after the Nissan stopped, the Ford hit the back passenger door of the Nissan.

Crystal testified that the driver of the Ford exited the vehicle and tried to stab defendant through the Nissan's window.  Defendant and Roach exited the car thereafter.  Rosa did not remember anyone reaching into the car with a knife, nor did T.C. see this either, although she did hear defendant say "something about a knife being thrown."

Defendant did not testify at trial, but his testimony under oath from "another hearing," in which the same prosecutor and the same attorney representing defendant were present, was read to the jury.  Defendant stated that the driver of the Ford exited the car, came up to the Nissan, and tried to stab defendant through the open window.  The passenger got into the driver's seat of the Ford and backed it up.  Defendant and Roach exited the Nissan and went towards the individual who had just tried to stab defendant.  Defendant stated that his "intent at that point in time ... was to fight this guy."  He felt that if he drove away, the occupants of the Ford "would have just kept coming."

T.C. was scared and Rosa was panicking.  Rosa got into the driver's seat of her car and started driving away.  Crystal yelled at Rosa to "[g]o back."  Crystal indicated that if Rosa "didn't go back" and defendant died, "it

was all going to be on" Rosa. Crystal also said that she would "mess [Rosa] up" if she did not go back. At defendant's trial, Crystal testified that she had pleaded guilty to a criminal threats charge for threatening Rosa at this point. She testified at defendant's trial as a result of an agreement with the district attorney's office. Prior to entering the agreement, she was charged with the same offenses as defendant and was facing a "substantial number of years in state prison." If she testified truthfully, she might receive credit for time served and "get a misdemeanor offense."

Rosa drove back to the scene where the males were fighting on a driveway. Defendant testified that he "sometimes" carried a knife, but denied having any weapons on him that day. He stated that he and Roach were hitting the individual and the individual stabbed defendant in the leg. Defendant and the individual then ran out of the way of the Ford, which was approaching them. Defendant wrestled the knife away from the individual and stabbed him repeatedly. Defendant stated that "it was more like a reaction, everything just happened." According to defendant, he never said anything to the individual and "there was no exchange of words through the whole incident from beginning to end." Defendant testified that that only he, and not Roach, stabbed the individual.

According to Rosa, when the Ford went up the driveway, the driver appeared to be trying to hit defendant and Roach. The participants in the fight "dispersed." The Ford then backed out of the driveway and onto the street, where it hit the front of Rosa's car. Either before or after Rosa's car was hit, defendant and Roach got into the backseat of Rosa's car. Crystal directed Rosa, who was still driving, out of the area.

Defendant's hands were cut and his leg had a "pretty severe wound" from the stabbing. A lot of his blood got onto the backseat of Rosa's car. Defendant and Roach were "boasting about how they hurt the other guys." Roach stated that "he got one of them really good" and that "he stabbed the guy deep." Defendant told Roach to "shut up" and "not to say anything about it." Defendant or Roach told the females, "you guys can't snitch. You guys can't tell anyone."

Defendant also told them, "You guys didn't see nothing; nothing happened, right." Defendant was "[b]asically saying [they] weren't there." Defendant testified that he was "[t]rying to keep people from cooperating with the police."

Defendant wanted to go to Roosevelt Park because it was "his hood." There were "a lot of cops" at the park however, so defendant said to "keep driving." Defendant directed Rosa to a house, where two men approached the car. Crystal believed that the house belonged to defendant's grandmother and that the men approaching were defendant's father and cousin. Defendant explained what happened. He "talked about stabbing the guys" and said that he "got them good" although he also got "cut."

Defendant then directed Rosa to drive to a second house. Crystal testified that it was defendant's aunt's house. T.C. believed defendant's cousin and a person named "Boxer" lived at the house. Boxer, like defendant, was a Norteño and affiliated with the Roosevelt Park Locos.

Everyone exited the car. Crystal told Rosa, "Calm down. Relax. Don't freak out. If you're not, they're going to fuck us up." They all went into the house. Eventually, the people at the house included defendant's dad, aunt, uncle, two of his cousins, and Boxer. Defendant at some point stated that "he got in a fight with some scraps, and that one of them stabbed him." Defendant, his dad, and his cousins told the three females "that [they] couldn't tell the cops, because they would ask too many questions."

T.C. heard defendant make a statement about her and Rosa "talking." He stated, "Snitches end up in ditches," which T.C. understood to mean that if she told the police, she would "get in trouble" or "would end up dying." Defendant also told T.C. more than once that "snitches don't get stitches; they end up in ditches." Additionally, he told T.C. that "you guys can't tell anyone or you'll get hurt."

One of the women at the house "was trying to stitch ... up" defendant's wound. Rosa, T.C., and Crystal were in the backyard. Rosa was scared. Crystal told her to "keep calm, to

not say anything, just relax."

Boxer, Roach, and possibly a third male followed Rosa and T.C. around. Rosa felt like she was being watched. While Rosa was outside the house, a male approached her and told her that she "had to do something about [her] car," that "it had blood on it" and "was crashed," and that she "had to deal with it." Rosa felt the man "was trying to brainwash [her] to think that it ... was [her] fault." He told her that they could burn the car and say that it was stolen.

When Rosa and T.C. went into the house, defendant, Crystal, Roach, and at least two other men and two other women were present. One of the men stated that they needed to come up with a story about what happened, and he, Crystal, and another woman started making suggestions about the story. Rosa was told to report to the police that her car had been stolen. The plan also included Roach and at least one other individual burning Rosa's car somewhere so "that way the cops couldn't see the blood" or "the D.N.A." Defendant was "helping to formulate [the] plan" about what they should tell the police and "occasionally" would say something during the discussion. For example, he said that T.C. was "not a good liar" and "to keep her out of it," and that they should say they were shopping so they would "have an excuse of why [they] left Rosa's car somewhere." Defendant's dad, uncle, cousins, Boxer, and Roach were also involved in telling the females what to say to the police.

Defendant testified that he "made comments" to "any or all of the girls about talking about this incident" involving the Ford and its occupants. He admitted that "[t]he words ... could be interpreted as a threat." He also acknowledged that he did not want anyone to talk about the incident because he was worried about it being reported to the police. He further admitted that he was involved in a discussion about what to do with Rosa's car and that he said it should be burned. He wanted the car burned because he bled all over the car and he wanted to get rid of the blood. He denied actually burning the car himself.

Rosa decided that she would "agree with whatever they" said so that she could leave

7

and that she would later tell the police "everything that happened." Rosa was worried because of Crystal's earlier comment that "if they saw us freaking ... they were going to fuck us up." Rosa felt that she "didn't have nowhere to run."

T.C. testified that she felt like she "couldn't leave" the house. She also testified that "everyone," including Boxer, Roach, and defendant, told her that she "couldn't tell the police" what had occurred. T.C. did not feel like she could tell the police the truth because she was being followed at the house and someone was "hovering around" her. She was worried about her life if she were to call the police. T.C. explained at trial that "if he was capable of stabbing someone that wasn't really anything to him, ... if they were capable of having that on their conscience and not feel any guilt towards that, ... what if someone, like, betrayed them?"

Roach told Crystal that she "couldn't tell the cops" and that she had to make sure that Rosa and T.C. "didn't tell the cops" either. Crystal told Rosa and T.C. to "do whatever the guys told them to do" because she did not want anything to happen to any of the three of them.

Rosa gave her car keys to Roach and Boxer. She felt that she had no choice and that "they might hurt" her. When Rosa was asked at trial whether there was anything that led her to believe that she would be harmed if she "didn't go along with the story," other than what Crystal said to her, Rosa responded, "I know a guy got stabbed because whatever. I mean, if they were willing to stab him, ... there was nothing to stop them to hurt me."

Crystal, Rosa, and T.C. left the house and went to get Crystal's car. Crystal told T.C. that defendant "is serious, and if we tell anyone, ... he will hurt us." Rosa and Crystal went to another location and reported the car stolen. Rosa participated in the lie about what happened to her car because she was afraid Crystal would "tell on" her to defendant. The police arrived and Rosa provided the fabricated story. The police told Rosa to "stop lying" and handcuffed her. Among other things, the police told Rosa that

they had a witness who had described her.
Rosa told the police that she did not want to
talk "on the street." At trial, Rosa
explained that she was afraid "somebody
else," including Crystal, might hear her
telling the truth to the police, that "they'd
know" it was her telling the truth, and that
"they would come after" her. She thought
"somebody would come after" her because "it
would be [her] fault ... that [defendant] and
Roach would get caught." After being taken
to the police station, Rosa disclosed the
truth about what had happened that day.
Crystal was arrested that same night, and
four months later she told police the truth
about what had happened.

When T.C. was initially questioned by the
police, she was scared. She lied and said
that she "didn't know anything." T.C. told
the truth after the police told her that
"they," in reference "to [defendant's] gang,"
would not "hurt" her and that the police
would "protect" her.

The police pulled the Ford over after the
incident occurred. The individual in the
passenger seat had been stabbed at least ten
times, including in his head, chest, abdomen,
back, hand, and leg. At the scene of the
stabbing, the police found a knife. At some
point, Rosa's car was found burned.

The parties stipulated that Norteños are a
criminal street gang as defined by section
186.22. The parties also stipulated that
defendant "is a member of the Nortenos,
specifically Roosevelt Park Locos."

b. Gang Expert Testimony
Rocky Zanotto, a detective in the gang
investigation unit for the San Jose Police
Department, testified as an expert on
Hispanic criminal street gangs. He explained
that Norteños associate with the number 14,
and will usually tattoo their bodies with
four dots and one dot. Their enemy, the
Sureños, associate with the number 13 and
will "tattoo three dots on their body as
opposed to four."

According to Detective Zanotto, music is one
"indicator for gang members to identify rival
gang members." Further, it is
"disrespectful" for a gang to play its
"gangster rap" music while driving through a

rival gang's neighborhood.  Regarding the CD that defendant played in Rosa's car, the detective believed it contained "Norteno gang rap," based on the CD cover and song titles.

Detective Zanotto explained that violence is "a way of life for gang members," and that gang members expect violence "on a daily basis."  If a violent confrontation occurs with a rival gang, "[y]ou are expected to step up and back up your fellow gang member." In the gang culture, violence "benefits gang members."  "[T]he more violent you are, the crazier you appear, the more street credibility you are going to get because nobody is going to mess with you.  Nobody is going to mess with your" specific gang. "When your gang commits a violent act, the whole gang gets the notoriety from rival gangs."  In addition, the violence "controls" and "terrorizes" the community.  If a gang has a violent reputation, community members will not call the police or testify against the gang.

Respect is important to gangs, including respect from other gangs.  If other gangs do not respect and fear a gang, that gang "will just dissolve."  If a gang member is believed to have been disrespected, the gang member is expected to not let it "go unchallenged" and to "deal with" it, which usually means violence.  Gang signs are displayed "to challenge rival gang members or in some cases to intimidate regular citizens."  If someone throws a gang sign at a Norteño, that gang member is "expected to react with some type of violence."

In gang culture, the concept of not cooperating with police is "one of the primary things that they live by."  Even if a gang member acted legally in responding to a fight, gang culture dictates that the member not cooperate with the police.  Gang members are viewed as cowards for cooperating with the police.  Further, police involvement interferes with the ability of gang members to "take care" of it themselves later on. Gang members also discourage nonmembers from reporting crimes to the police.  This benefits the gang "[b]ecause it allows the gang to thrive and grow."  "They can sell drugs in the open.... They can commit crimes against rivals and not worry about Joe Citizen sitting on his porch smoking and

say[ing] no, he did it.  I saw the whole thing."

Based on a review of the facts in this case, which included reviewing police reports and information from the investigating officer, Detective Zanotto believed that the occupant of the Ford who had been stabbed was a Sureño.  As for the other occupant, he testified that if the individual is in the same car, he is "definitely an associate" and "[i]f he is participating in that crime in any way, then he is a member."

Detective Zanotto testified that the Norteño gang would benefit by telling witnesses not to report the events of May 4, 2007, if the gang members "were able to spin this crime and not have the police get involved."  Once others learned about defendant's actions, "what he did and how he reacted appropriately," that is going to "give him more status in the gang."  "And by getting away with the crime and being able to dissuade witnesses," the gang member "personally benefits" by not going to jail. At the same time, the gang benefits because the gang member does not go to jail, the "true facts of the case are never really revealed" while the version relayed always "supports" the gang's cause, and it "benefits the gang's reputation because they were able to stab a Sureño numerous times" and get away with it.  Further, dissuading witnesses who are not a part of the gang culture benefits the gang because the fear instilled in the witnesses will be communicated to others, and those people in the community "are not going to testify against gang members in the future."

Detective Zanotto believed that the events that occurred on May 4, 2007, leading up to the stabbing, were gang related based on the "totality of everything," including the music, the hand gestures between the cars, defendant's reference to "scraps," the back-and-forth exchange by a group of gang members," and the end result of violence, "which is very common."  The detective also referred to evidence concerning the Nissan being pulled over, as opposed to being forced off the road or disabled so that it could not be driven.  Further, the detective identified events after the stabbing that suggested the incident was gang related, including driving

to Roosevelt Park, going to a family member's house where one family member had medical training, getting stitched up at the house, the arrival of another gang member at the house, the formulating of a plan to get rid of evidence, and the "snitches" and "ditches" statement.

Regarding the burning of Rosa's car and the statements concerning the hiding of DNA evidence from defendant's blood, Detective Zanotto testified that hiding the blood would personally benefit defendant as well as the gang. The gang would benefit because evidence of the underlying violent act would be destroyed.

In Detective Zanotto's opinion, the attempted dissuasion of witnesses was committed for the benefit of or in association with a criminal street gang, the Norteños. He explained that the gang will benefit because "if they can dissuade citizens not to testify, they are never going to be caught. They can kill people at will and nobody is ever going to convict them and send them to jail." Detective Zanotto believed that the crime of attempted witness dissuasion was committed in association with other gang members, based on the presence of three gang members, including Boxer and Roach, at the residence "directing people to do different things."

The defense rested without proffering any testimony or other evidence. Defense counsel conceded to the jury that defendant was guilty of both counts of attempting to dissuade witnesses and the count for arson. Defense counsel told the jury that it had to decide whether defendant committed the crimes "for the benefit, association with a gang" and whether defendant had the requisite specific intent under the gang allegations.

Lopez, 2012 WL 1264451, at *1-7 (footnote omitted).

III

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United

States."  28 U.S.C. § 2254(a); <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  <u>Penry v. Johnson</u>, 532 U.S. 782, 795 (2001) (internal quotation marks omitted).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  <u>Id</u>. at 413.

United States District Court
Northern District of California

13

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.  Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

When applying these standards, the federal court should review the "last reasoned decision" by the state courts.  See

14

<u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the state's highest court, the court "looks through" to the last reasoned opinion.  <u>See Ylst</u>, 501 U.S. at 804.

With these principles in mind regarding the standard and scope of review on federal habeas, the Court addresses Petitioner's claims.  Petitioner alleges that: 1) there was insufficient evidence to support the specific intent element of the gang allegations and the trial court erred in giving a special instruction regarding the allegations; 2) there was an erroneous jury instruction regarding the "proof of threats" element; 3) the gang expert provided improper opinion testimony; 4) the gang expert improperly testified regarding a gang slogan; and 5) cumulative error.

IV

A

Petitioner first contends that there was insufficient evidence to support the gang enhancements for all three counts. He argues there was insufficient evidence that any of the crimes were committed with the specific intent to promote or assist other criminal conduct by gang members.  He also argues that the trial court erred in issuing a jury instruction regarding specific intent.

The gang allegation for each count required proof that Petitioner committed the offense "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any

15

criminal conduct by gang members." § 186.22, subd. (b)(1) & (4).
This scienter requirement "applies to <u>any</u> criminal conduct,
without a further requirement that the conduct be 'apart from'
the criminal conduct underlying the offense of conviction sought
to be enhanced." <u>People v. Albillar</u>, 51 Cal. 4th 47, 66 (2010).
In addition, "[t]here is no further requirement that the
defendant act with the specific intent to promote, further, or
assist a <u>gang</u>; the statute requires only the specific intent to
promote, further, or assist criminal conduct by <u>gang members</u>.
[Citations.]" <u>Id</u>. at 67.

The trial court instructed the jury with CALCRIM 1401 which
states that the prosecution had to prove Petitioner "intended to
assist, further, or promote criminal conduct by gang members."
Reporter's Transcript ("RT") at 1339.  The trial court also gave
an instruction requested by the prosecution that "defendant's own
conduct may qualify as the gang-related criminal activity. [¶]
There is no requirement that the defendant intended to assist or
promote criminal activity other than his own."  RT at 1341.

The California Court of Appeal discussed relevant state law
and denied the claim regarding the jury instruction as follows:

> We agree with the conclusion in <u>People v.
> Hill</u>, <u>supra</u>, 142 Cal. App. 4th 770, that the
> specific intent element may be satisfied when
> the defendant gang member intended to promote
> or further the defendant's own gang related
> criminal conduct, and that the defendant's
> specific intent need not relate to criminal
> activity apart from the offense that the
> defendant commits.  (<u>Id</u>. at p. 774.)
>
> . . .
>
> Here, with respect to the specific intent
> element of subdivision (b)(1) and (4) of

16

section 186.22, a defendant gang member who commits a gang related felony can commit that felony with the specific intent to promote or further criminal conduct by a gang member— that same felony by the defendant gang member. It is not reasonable that the Legislature, in attempting to deter criminal gang activity, intended the punishment provided by that subdivision to apply to a defendant committing a gang related crime with the intent to promote or further criminal conduct by other gang members, but not apply the punishment if the defendant intends to promote or further criminal conduct committed by the defendant gang member himself or herself.

We are not persuaded by defendant's argument that the reference to "gang members" in the plural (§ 186.22, subd. (b)(1) & (4)) means that the statute requires the defendant to have specifically intended to promote or further criminal conduct by another gang member. We believe that a reference to "gang members" in the plural in subdivision (b)(1) and (4) of section 186.22 may mean "gang member" in the singular. (See § 7 [the plural number includes the singular, and words and phrases must be construed according to the context].)

In sum, we believe that the specific intent element may be satisfied when a defendant gang member commits the underlying offense with the specific intent to promote or further the defendant's own gang-related criminal conduct, and that the defendant's specific intent need not relate to criminal activity apart from the charged offense that the defendant committed. In this case, the trial court instructed the jury pursuant to CALCRIM No. 1401 that the prosecution had to prove defendant "intended to assist, further, or promote criminal conduct by gang members." Defendant stipulated that he was a member of a criminal street gang. The trial court's special instruction stated: "The defendant's own conduct may qualify as the gang-related criminal activity. [¶] There is no requirement that the defendant intended to assist or promote criminal activity other than his own." This special instruction correctly informed the jury that the specific intent element may be satisfied if the defendant intended to promote his own gang-related criminal activity. Because the trial

United States District Court
Northern District of California

United States District Court
Northern District of California

court's special instruction was not erroneous, we conclude that defendant's substantial rights were not affected by the instruction. (§ 1259.)

_Lopez_, 2012 WL 1264451, at *9-10. The California Court of Appeal also found that there was sufficient evidence to support the specific intent element of the gang enhancements:

> [S]ubstantial evidence supports the specific intent element of the gang allegations for the attempted dissuasion and arson counts. At trial, defendant stipulated that he was a member of Norteños, a criminal street gang. The evidence established that Roach and Boxer were also Norteño gang members. As defendant acknowledges, it was conceded at trial that he committed the attempted dissuasion counts and that he assisted in burning Rosa's car to cover up his blood. The evidence at trial further reflected that defendant, Roach, and Boxer jointly participated in these crimes. Defendant verbally attempted to dissuade Rosa and T.C., and Roach and Boxer told T.C. that she could not tell the police what had occurred. Further, Roach told Crystal that she had to make sure that Rosa and T.C. did not tell the police what had happened. Roach and Boxer also followed Rosa and T.C. around. All three gang members participated in the creation of the false story and the plan to burn Rosa's car. A reasonable inference arises that the gang members' efforts were directed at hiding from the police any evidence linking defendant and Roach to the earlier incident involving the stabbing of a rival gang member. Defendant does not dispute that there is substantial evidence that he committed the offenses, attempted dissuasion and arson, for the benefit of the gang. In view of the record, we believe that substantial evidence also supports the inference that defendant committed these gang-related offenses with the intent to promote or further these gang-related offenses by defendant himself. A rational factfinder might have also reasonably concluded that defendant intended to assist Roach and Boxer in the commission of these offenses. (See _Albillar_, _supra_, 51 Cal.4th at p. 68.) In sum, we determine that substantial evidence supports the specific intent element of the gang allegations.

18

1    Lopez, 2012 WL 1264451, at *11.

2         A challenge to a jury instruction solely as an error under

3    state law does not state a claim cognizable in federal habeas

4    corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72

5    (1991).  To obtain federal collateral relief for errors in the

6    jury charge, a petitioner must show that the ailing instruction

7    by itself so infected the entire trial that the resulting

8    conviction violates due process.  See id. at 72; Cupp v.

9    Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v.

10   DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be

11   established not merely that the instruction is undesirable,

12   erroneous or even 'universally condemned,' but that it violated

13   some [constitutional right].'").  The instruction may not be

14   judged in artificial isolation, but must be considered in the

15   context of the instructions as a whole and the trial record.  See

16   Estelle, 502 U.S. at 72.

17        The Due Process Clause "protects the accused against

18   conviction except upon proof beyond a reasonable doubt of every

19   fact necessary to constitute the crime with which he is charged."

20   In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who

21   alleges that the evidence in support of his state conviction

22   cannot be fairly characterized as sufficient to have led a

23   rational trier of fact to find guilt beyond a reasonable doubt

24   therefore states a constitutional claim, see Jackson v. Virginia,

25   443 U.S. 307, 321 (1979), which, if proven, entitles him to

26   federal habeas relief, see id. at 324.

27        The Supreme Court has emphasized that "Jackson claims face a

28   high bar in federal habeas proceedings . . . ."  Coleman v.

United States District Court
Northern District of California

19

1   <u>Johnson</u>, 132 S. Ct. 2060, 2062, 2064 (2012) (per curiam) (finding

2   that the Third Circuit "unduly impinged on the jury's role as

3   factfinder" and failed to apply the deferential standard of

4   <u>Jackson</u> when it engaged in "fine-grained factual parsing" to find

5   that the evidence was insufficient to support petitioner's

6   conviction).  A federal court reviewing collaterally a state

7   court conviction does not determine whether it is satisfied that

8   the evidence established guilt beyond a reasonable doubt.  <u>Payne</u>

9   <u>v. Borg</u>, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court

10  "determines only whether, 'after viewing the evidence in the

11  light most favorable to the prosecution, <u>any</u> rational trier of

12  fact could have found the essential elements of the crime beyond

13  a reasonable doubt.'"  <u>Payne</u>, 982 F.2d at 338 (quoting <u>Jackson</u>,

14  443 U.S. at 319).

15      Petitioner is not entitled to habeas relief for these

16  claims.  The jury instructions issued by the trial court have

17  been upheld by state courts.  To the extent Petitioner argues

18  there was an error under state law, he is not entitled to federal

19  habeas relief.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991)

20  (stating that "it is not the province of a federal habeas court

21  to reexamine state-court determinations on state-law questions").

22  In addition, the Ninth Circuit has rejected arguments similar to

23  what Petitioner presents.  <u>See</u> <u>Emery v. Clark</u>, 643 F.3d 1210,

24  1215-16 (9th Cir. 2011) ("To sustain Emery's gang enhancements,

25  there must have been evidence upon which a rational trier of fact

26  could find that Emery acted with the 'specific intent to promote,

27  further or assist in' <u>some</u> type of 'criminal conduct by gang

28  members,' which may include the crimes of conviction.").  Nor has

United States District Court
Northern District of California

20

he demonstrated that the jury instruction so infected the entire trial that the resulting conviction violates due process.

Petitioner has also failed to demonstrate that the state court's determination regarding the sufficiency of the evidence was an unreasonable application of Supreme Court authority. Petitioner conceded that he committed the underlying crimes, and the California Court of Appeal described the abundance of evidence establishing that Petitioner committed the crimes with the specific intent to promote, further, or assist criminal conduct by gang members.  Looking at all of this evidence, a rational juror could have found that Petitioner's actions intended to further criminal conduct by gang members.  Petitioner is not entitled to habeas relief on these claims.

B

Petitioner next argues that the trial court failed to instruct the jury on the "proof of threat" element required for the life-term gang enhancement each of the two counts of dissuading a witness for the benefit of a criminal street gang.

Petitioner was charged with life-term gang enhancements for count 1, dissuading Rosa, and count 2, dissuading T.C.  He was charged with the standard gang enhancement for count 3, the arson charge.  Unlike the standard gang enhancement, the life-term enhancement contains the additional element of making threats. The trial court gave the same instruction for each of the three enhancements, thus omitting the requirement that the jury find that Petitioner made threats to support the life-term gang enhancements for counts 1 and 2.

On direct appeal Respondent conceded error but argued the

error was harmless.   The California Court of Appeal found the

error harmless with respect to count 2, dissuading T.C, but

reversed the life-term gang enhancement for count 1, dissuading

Rosa.   Petitioner now argues that the enhancement regarding T.C.

should be reversed.

The California Court of Appeal stated the following in

finding the error harmless with respect to T.C.:

> In this case, as to count 2, regarding the
> attempted dissuasion of T.C. and the
> accompanying gang allegation, we determine
> that the trial court's error in failing to
> instruct regarding the requirement of an
> express or implied threat was harmless beyond
> a reasonable doubt.   T.C. testified that she
> heard defendant say, "[s]nitches end up in
> ditches," in reference to her and Rosa
> "talking."   T.C. understood this statement to
> mean that if she told the police, she would
> "get in trouble" or "would end up dying."
> Defendant also told T.C. more than once that
> "snitches don't get stitches; they end up in
> ditches."   Additionally, he told T.C. that
> "you guys can't tell anyone or you'll get
> hurt."   T.C's testimony that she heard these
> statements from defendant was uncontroverted.
> Indeed defendant admitted that he made
> comments to one or more of the three females
> "about talking about [the] incident" and that
> his comments "could be interpreted as a
> threat."   Given the words used by defendant,
> we do not believe the statements could be
> interpreted as something other than threats
> of force or violence.   (§ 136.1, subd. (c)(1)
> [attempt to dissuade must be accompanied by
> "an express or implied threat of force or
> violence"]; see People v. Mendoza (1997) 59
> Cal.App.4th 1333, 1344 [violation of section
> 136.1, subdivision (c)(1) may be established
> where the defendant's words or actions
> support inference that the defendant
> attempted by threat of force to induce
> withholding testimony].)   In view of the
> uncontradicted testimony by T.C. that
> defendant made multiple threats to her
> concerning talking to the police, and
> defendant's admission that he threatened at
> least one of the females, we conclude that

United States District Court
Northern District of California

1

> the jury could not have rationally found the
> omitted threat element unproven as to the
> count pertaining to the attempted dissuasion
> of T.C. (See People v. Ortiz (2002) 101 Cal.
> App. 4th 410, 416 [holding that failure to
> instruct on threat element was harmless
> beyond a reasonable doubt where
> uncontradicted testimony of the defendant's
> statements to the victim was such that "no
> reasonable jury could have decided" the
> defendant made the statements "and yet have
> viewed the statements ... as not threatening
> force"].) The instructional error as to the
> threat element was therefore harmless as to
> the true finding on the gang allegation for
> count 2.

2

3

4

5

6

7

8

9   Lopez, 2012 WL 1264451, at *15.

10      A jury instruction that omits an element of an offense is

11  constitutional error subject to "harmless error" analysis. See

12  Neder v. United States, 527 U.S. 1, 8-11 (1999) (direct review);

13  Evanchyk v. Stewart, 340 F.3d 933, 940 (9th Cir. 2003) (§ 2254

14  case). Harmless error applies whether the error is characterized

15  as a misdescription of an element of an offense in a jury

16  instruction, or as an omission of the element. See California v.

17  Roy, 519 U.S. 2, 5 (1996) (omission of "intent" element from

18  aiding and abetting instruction subject to harmless error

19  analysis where jury could have found intent based on evidence it

20  considered); Evanchyk, 340 F.3d at 940-41 (violation of due

21  process based on jury instructions that omitted "intent" element

22  of first-degree felony murder subject to harmless error

23  analysis).

24      The omission will be found harmless unless it "'had

25  substantial and injurious effect or influence in determining the

26  jury's verdict.'" Roy, 519 U.S. at 4 (quoting Brecht v.

27  Abrahamson, 507 U.S. 619, 637 (1993)). Where the trial court

28  simply fails to alert the jurors that they must consider an

United States District Court
Northern District of California

23

element of the crime, the omission is harmless if review of the facts found by the jury establishes beyond a reasonable doubt that the jury necessarily found the omitted element.  <u>See Uchimura v. United States</u>, 125 F.3d 1282, 1287 (9th Cir. 1997) (applying plain error analysis on direct review of a federal criminal conviction); <u>see</u>, <u>e.g.</u>, <u>Neder</u>, 527 U.S. at 15-20 (error harmless because "the omitted element was uncontested and supported by overwhelming evidence").  But if the reviewing federal habeas court is in grave doubt as to whether the error had substantial and injurious effect or influence in determining the jury's verdict, the petitioner is entitled to the writ.  <u>See Evanchyk</u>, 340 F.3d at 940-42.

Petitioner is not entitled to habeas relief.  A review of the records indicates that T.C. testified to several threats that Petitioner made towards her.  Any error made by omitting the element from the jury instruction was harmless due to the uncontroverted evidence that Petitioner threatened T.C.  The evidence presented at trial established beyond a reasonable doubt that the jury necessarily found the omitted element.  The intent element evidence was uncontested and supported by a great deal of evidence.  This is not a situation where the Court is in grave doubt regarding the error.  The error did not have a substantial and injurious effect on the jury verdict; therefore, the claim is denied.

C

Petitioner next contends that the prosecution's gang expert provided improper expert testimony that usurped the jury's role.  The California Court of Appeal set forth the relevant background

24

1

for this claim:

2

3          During a hearing on motions in limine,
           defense counsel acknowledged that the expert
4          may "talk about the benefit and association"
           element of the gang allegations. He stated,
5          however, that he was "concerned" about the
           prosecution's gang expert testifying about
6          "an ultimate issue of fact" and particularly
           defendant's specific intent.  The prosecutor
7          agreed that the expert "cannot testify as to
           the specific intent the defendant had."  The
8          trial court granted defense counsel's
           "request," ruling that the gang expert may
9          offer an opinion regarding whether the crime
           was committed for the benefit of, at the
10         direction of, or in association with a
           criminal street gang, but that the expert was
11         precluded from offering an opinion on whether
           defendant had the requisite specific intent
12         under section 186.22.

13         At the beginning of the testimony by the gang
           expert, the trial court instructed the jury
14         pursuant to CALCRIM No. 332 as follows: "This
           witness will be allowed to testify as an
15         expert and to give opinions.  You must
           consider the opinions, but you are not
16         required to accept them as true and correct.
           The meaning and importance of any opinions
17         are for you to decide.  In evaluating the
           believability of an expert witness, follow
18         the instructions about the believability of
           witnesses generally.  In addition, consider
19         the expert's knowledge, skill, experience,
           training and education, the reasons the
20         expert gave for an opinion, and the facts or
           information on which the expert relied on in
21         giving the opinion.  You must decide whether
           the information on which the expert relied
22         ... was true and accurate.  And you may
           disregard any opinion that you find
23         unbelievable, unreasonable, or unsupported by
           the evidence."

24         Relevant to defendant's contentions on
           appeal, the gang expert, Detective Zanotto,
25         was asked at trial if he "ha[d] an opinion as
           to whether or not the dissuading of the
26         witnesses was committed for or in association
           with a criminal street gang, the Norteños."
27         The detective stated, "Yes."  When asked for
           his opinion in that regard, Detective Zanotto
28         explained that both the individual

25

personally, as well as the gang would "reap the benefits of getting away with dissuading someone not to testify. And it goes back to if they can dissuade citizens not to testify, they are never going to be caught. They can kill people at will and nobody is ever going to convict them and send them to jail." The prosecution then asked the detective, "in regards to the association, what are you basing your opinion on this crime was committed in association with other gang members?" Detective Zanotto answered: "During the time at the residence, it's my opinion there were three members of a criminal street gang there directing people to do different things." The detective subsequently testified that Boxer and Roach were two of the three gang members to whom he was referring.

After the close of evidence, the trial court again instructed the jury pursuant to CALCRIM No. 332 concerning expert witness testimony. The court also instructed the jury: "An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume that certain facts are true and then to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. And if you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion." (See CALCRIM No. 332.)

Lopez, 2012 WL 1264451, at *16-17.

The California Court of Appeal then denied this claim stating:

In this case, contrary to defendant's contention, the testimony at issue did not concern defendant's specific intent. The expert's testimony, as framed by the questions posed to him, was directed to another element of the gang allegations: whether the crime was committed "*for the benefit of ... or in association with* any criminal street gang." (§ 186.22, subd. (b)(4), italics added.) Specifically, Detective Zanotto was asked whether he had an opinion regarding whether "the dissuading of the witnesses was committed *for* or in *association with* a criminal street gang, the

Norteños" (italics added), and he responded affirmatively. In response to further questioning, the detective explained how the gang would benefit, and he stated the basis for his opinion that the crime was committed in association with other gang members. In contrast, the specific intent element of the gang allegations requires proof that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members." (Ibid.) The challenged testimony here did not offer the expert's opinion on defendant's specific intent. Rather, the testimony offered an explanation as to why Norteño gang members in general would be motivated to attempt to dissuade witnesses from reporting the activities of gang members. If they dissuade witnesses, they will not get "caught" for those activities. They can commit crimes "at will" and will never be punished. Although the testimony explained defendant's possible motivation for attempting to dissuade Rosa and T.C., the gang expert did not offer an opinion as to whether defendant actually harbored the requisite specific intent when engaging in the conduct.

Further, the subject matter of the challenged testimony by Detective Zanotto was a proper area of expert testimony because it pertained to the culture and habits of Norteños, an area "sufficiently beyond common experience." (Evid.Code, § 801, subd. (a); see also Gardeley, supra, 14 Cal.4th at p. 617; Killebrew, supra, 103 Cal.App.4th at p. 657.) As we explained, the detective's testimony offered an explanation as to why Norteños in general would be motivated to attempt to dissuade witnesses from reporting the activities of gang members. If they dissuade witnesses, they will not get "caught" or punished for those activities. The detective had also earlier explained that discouraging the reporting of crimes "allows the gang to thrive and grow." "They can commit crimes against rivals and not worry about Joe Citizen sitting on his porch smoking and say[ing] no, he did it. I saw the whole thing." The detective also testified that the gang benefits because the gang member does not go to jail, the "true facts of the case are never really revealed" while the version relayed always "supports" the gang's cause, and it "benefits the gang's reputation because they were able to stab a Sureño

numerous times" and get away with it. In sum, the expert's testimony regarding the motivation of Norteños concerned a subject matter well beyond common experience.

Moreover, although Detective Zanotto referred to Boxer, Roach, and implicitly defendant as "directing people to do different things" at the residence, the testimony was in response to the prosecution's question about the basis for his opinion that the crime was committed in association with other gang members. The jury was twice instructed, before expert testimony by Detective Zanotto and at the close of evidence, that in evaluating the believability of an expert witness, the jury should consider "the reasons the expert gave for an opinion, and the facts or information on which the expert relied on in giving the opinion." The jury was further instructed that it "must decide whether the information on which the expert relied ... was true and accurate," and that it "may disregard any opinion that [it] find[s] unbelievable, unreasonable, or unsupported by the evidence." We must presume the jury followed the court's instructions. (People v. Gray (2005) 37 Cal.4th 168, 231.) Accordingly, we determine that the challenged testimony by the gang expert was properly admitted.

Lopez, 2012 WL 1264451, at *18.

The United States Supreme Court has left open the question of whether the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact. See Moses v. Payne, 555 F.3d 742, 761 (9th Cir. 2009). Thus, while, under Ninth Circuit precedent, it is "well established . . . that expert testimony concerning an ultimate issue is not per se improper," id. (internal quotation marks omitted), for purposes of habeas corpus review no Supreme Court case has squarely addressed the issue and, therefore, a state appellate court's decision affirming the admission of such testimony is not contrary to or an unreasonable application of clearly established Supreme Court precedent. See id. at 761-62;

28

1  see, e.g., Briceno v. Scribner, 555 F.3d 1069, 1078 (9th Cir.

2  2009) (habeas relief not available under § 2254(d) for claim that

3  expert's opinion testimony as to whether hypothetical robberies

4  would have been gang-related should have been excluded because it

5  pertained to an ultimate issue of fact for the jury to decide).

6      Petitioner has failed to demonstrate that the state court

7  opinion was an unreasonable application of Supreme Court

8  authority.  As noted above, there is no Supreme Court authority

9  regarding this issue.  The facts of this case are quite similar

10 to Briceno, where the Ninth Circuit found that the petitioner was

11 not entitled to relief.  For those same reasons, Petitioner's

12 claim is denied.

13     Moreover, a review of the record demonstrates that the

14 expert witness did not usurp the jury's role.  The expert did not

15 testify regarding Petitioner's specific intent.  The expert

16 testified regarding gang culture and what actions and behavior

17 would benefit a street gang.   While the prosecutor asked

18 hypothetical questions, they were proper.  The trial court

19 repeatedly instructed the jury on the proper manner to view

20 expert testimony and that the jury was responsible to determine

21 if a fact had been proven.  For all these reasons, this claim is

22 denied.

23                              D

24     Petitioner also argues that the gang expert improperly

25 relied on a police report containing hearsay that indicated

26 Petitioner or his accomplice yelled a gang slogan.  He maintains

27 this violated the Confrontation Clause and his right to due

28 process.

1

2

3          The following occurred at trial:

4              At trial, [gang expert] Detective Zanotto
           indicated that he had reviewed police reports
5          containing statements by the individual from
           the Ford who was stabbed.  The detective was
6          then asked whether this individual had
           reported that defendant stated gang slogans
7          "while this event was occurring on May 4th
           out on that driveway."  Detective Zanotto
8          testified, "I don't know specifically if he
           said the defendant, but somebody made some
9          gang slogans."  In response to further
           questioning, Detective Zanotto indicated that
10         this information "help[ed] form" his opinion
           that the attempted dissuasion of Rosa and
11         T.C. was committed for the benefit of the
           gang.  On cross-examination, Detective
12         Zanotto acknowledged that he did not have a
           statement from any other individual regarding
13         gang slogans being made.  On redirect
           examination, the detective indicated that the
14         individual had reported the gang slogans
           while he was in the infirmary at jail.

15             . . .

16             After the expert testified, and outside the
           presence of the jury, defense counsel stated
17         his objection on the record to the testimony
           by the expert regarding gang slogans.
18         According to defense counsel, a police report
           stated that when defendant and Roach exited
19         the car, they "yelled puro ... Norte, showing
           their willingness to commit extreme acts of
20         violence for the benefit of the Norteño
           movement...."  The individual from the Ford
21         had apparently reported these gang slogans to
           the police.  Relying on People v. Coleman
22         (1985) 38 Cal. 3d 69 (Coleman) and Crawford
           v. Washington (2004) 541 U.S. 36 (Crawford),
23         among other authorities, defense counsel
           argued that the expert was being allowed to
24         testify that the gang slogan had been made,
           which was an ultimate issue of fact in the
25         case; the statement by the individual from
           the Ford was being used for the truth of the
26         matter, was testimonial in nature, and its
           validity or truthfulness was questionable;
27         and the statement was prejudicial while the
           probative value was questionable.  Defense
28         counsel further stated that he agreed only
           "under protest" to "watering . . . down" the
           testimony by "referring to slogans and not

United States District Court
Northern District of California

30

using the specific statement." The trial
court explained that when the objection was
previously discussed in chambers, the court
engaged in an Evidence Code section 352
analysis and "thought [the proposed
testimony] was more probative than
prejudicial." After the court indicated that
the proposed testimony would be permitted,
the parties "and the officer talked about
basically watering down the actual statement
to a gang slogan . . . ."

The trial court later gave a limiting
instruction to the jury as follows: "Officer
Rocky Zanotto testified that in reaching his
conclusions as an expert witness, he
considered statements made by other persons
such as other law enforcement officers, crime
victims, gang members, and statements made by
[the individual from the Ford] to San Jose
police officers. You may consider those
statements only to evaluate the expert's
opinion. Do not consider those statements as
proof that the information contained in the
statements is true." (See CALCRIM No. 360.)

<u>Lopez</u>, 2012 WL 1264451, at *18-19.

The California Court of Appeal denied this claim as follows:

In this case, we determine that the trial
court properly admitted the gang expert's
testimony regarding an individual's statement
about gang slogans, and that the trial
court's limiting instruction was sufficient
to address any potential prejudice from
admission of the statement. The expert's
testimony was relevant to show the basis for
his opinion. Further, the testimony about
the statement concerning gang slogans was
relatively brief, and the testimony did not
indicate who uttered the gang slogan or the
specifics of what was expressed. This
reduced the potential for prejudice from the
statement. Moreover, the court instructed
the jury that it may consider the statement
by the individual "only to evaluate the
expert's opinion," and that the statement was
not to be considered "proof that the
information contained in the [statement] is
true." (See CALCRIM No. 360.) We do not
believe the instructions would have been
ineffective in this case, as defendant
argues. (Cf. <u>Coleman</u>, <u>supra</u>, 38 Cal. 3d at
p. 92 ["in aggravated situations, where

hearsay evidence is recited in detail, a limiting instruction may not remedy the problem"].)

. . .

[W]e conclude that the challenged testimony concerning gang slogans was properly admitted to show the basis of Detective Zanotto's opinion, and was not admitted for the truth of the statement concerning gang slogans. Thus, admission of the testimony did not violate the confrontation clause.

Even if the expert's testimony concerning a statement about gang slogans should have been excluded, we find that defendant was not prejudiced by any error in the admission of the testimony. A confrontation clause violation is subject to federal harmless-error analysis under Chapman, supra, 386 U.S. at page 24. (Delaware v. Van Arsdall (1986) 475 U.S 673, 681–682, 684.) "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (Id. at p. 681.)

In this case, there was overwhelming evidence that the attempted dissuasion counts were gang related, and that evidence included facts showing that the underlying incident involving the Ford was gang related. When defendant and another Norteño gang member were in Rosa's car, defendant played Norteño rap music. The music made references to scraps, a derogatory reference to Sureños, and to beating and killing them. The music was playing loudly while all the windows were rolled down. When Rosa's car was near the Ford, the occupants, who were Sureños, made gang signs, which are generally used to challenge a rival gang. Defendant was angry, referred to them as scraps, flipped them off, and yelled at them. After the two cars stopped, defendant suffered a stab wound while one of the occupants of the Ford was stabbed multiple times.

In describing to others what had happened, defendant stated that he had been in a fight with "some scraps, and that one of them stabbed him." Crystal testified that whenever she went out with defendant, he said that if anything happened when she was around

him, she could not tell on him.  After the stabbing incident, defendant similarly told all the females in Rosa's car that they "didn't see nothing" and "nothing happened." Crystal testified that defendant and others "from his gang" used to say that "'snitches' ... 'get stitches or end up in ditches.'" Defendant made similar statements to T.C. after the stabbing incident.

At the second house where the group stopped, another Norteño gang member, Boxer, was present.  This gang member and Roach, also a Norteño, followed Rosa and T.C. around. Roach told Crystal that he did not want any of the females talking to the police.  Defendant, Roach, and Boxer were involved in telling the females what to say to the police.  Roach and Boxer obtained Rosa's car keys and her car was later burned.

Detective Zanotto believed that the events that occurred on May 4, 2007, leading up to the stabbing, were gang related based on the "totality of everything," including the music, the hand gestures between the cars, the reference to "scraps" by defendant, the "back-and-forth exchange by a group of gang members, and the end result was violence, which is very common."  The detective also referred to evidence concerning the Nissan being pulled over, as opposed to being forced off the road or disabled so that it could not be driven.  Further, the detective identified events after the stabbing that suggested the incident was gang related, including driving to Roosevelt Park, going to a family member's house where one family member had medical training, getting stitched up at the house, the arrival of another gang member at the house, the formulating of a plan to get rid of evidence, and the "snitches" and "ditches" statement.

The challenged testimony by the expert, that "somebody made some gang slogans" at some point after the Nissan and the Ford stopped in the residential area, lacked any specifics about who uttered the gang slogans as well as what specifically was expressed.  Further, the defense on cross-examination elicited an acknowledgment from Detective Zanotto that there was no statement from any other individual regarding gang slogans being made, other than the statement by the individual from the Ford.

33

> Although the prosecutor in argument to the
> jury made reference (without any objection
> from the defense) to the testimony concerning
> gang slogans, that reference was relatively
> brief. Further, the prosecutor made the
> reference in the context of arguing that,
> even if the jury accepted defendant's
> testimony that no words were exchanged during
> the stabbing incident, defendant's testimony
> still supported the inference that the
> incident was gang related. The prosecutor
> argued: "I mean, although it would make sense
> that things [gang slogans] were said like
> that in this exchange, this is scarier. So
> again the defendant knows why this fight is
> occurring. He doesn't even have to talk
> about it.... He doesn't have to say one word
> to this guy and the other guy who is driving
> the car and getting out of the car and going
> what's going on here? Because the defendant
> knows this is all about the gang. The
> defendant knows this is all about the life.
> He knows these aren't random individuals just
> coming up and he had to defend himself. He
> knows this is part of what occurs in gang
> culture. So there is no exchange of words."
>
> In sum, in considering the strength of the
> prosecution's case that the crime was gang
> related, including the evidence showing that
> the underlying incident involving the
> stabbing of the individual from the Ford was
> gang related, and in view of the somewhat
> ambiguous testimony about gang slogans being
> uttered, we believe that any error in
> admitting the testimony was harmless beyond a
> reasonable doubt.

Lopez, 2012 WL 1264451, at *20-23 (footnote omitted).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Crawford v. Washington, 541 U.S. 36, 61 (2004). An expert may render an opinion and explain the facts on which that opinion is based without violating the Confrontation Clause. Williams v. Illinois, 132 S. Ct. 2221, 2228 (2012) ("When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the

1   expert about any statements that are offered for their truth.

2   Out-of-court statements that are related by the expert solely for

3   the purpose of explaining the assumptions on which that opinion

4   rests are not offered for their truth and thus fall outside the

5   scope of the Confrontation Clause."); Hill v. Virga, 588 Fed.

6   App'x 723, 724 (9th Cir. 2014) (Supreme Court has not clearly

7   established that admission of hearsay statements relied on by

8   expert violates Confrontation Clause).[2]

9       Confrontation Clause claims are subject to harmless error

10  analysis.  United States v. Nielsen, 371 F.3d 574, 581 (9th Cir.

11  2004) (post-Crawford case); see also United States v. Allen, 425

12  F.3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas

13  corpus review, the standard applicable to violations of the

14  Confrontation Clause is whether the inadmissible evidence had an

15  actual and prejudicial effect upon the jury.  See Hernandez v.

16  Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing Brecht).

17  The admission of evidence is not subject to federal habeas review

18  unless a specific constitutional guarantee is violated or the

19  error is of such magnitude that the result is a denial of the

20  fundamentally fair trial guaranteed by due process.  See Henry v.

21  Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).  The Supreme Court

22  "has not yet made a clear ruling that admission of irrelevant or

23  overtly prejudicial evidence constitutes a due process violation

24  sufficient to warrant issuance of the writ."  Holley v.

25  Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that

26

27  [2] The Supreme Court decided Williams on June 18, 2012, after the
    California Court of Appeal issued its opinion.  The California
28  Supreme Court denied Petitioner's petition for review on June 27,
    2012.  Ex. L

35

1  trial court's admission of irrelevant pornographic materials was

2  "fundamentally unfair" under Ninth Circuit precedent but not

3  contrary to, or an unreasonable application of, clearly

4  established federal law under § 2254(d)).  Failure to comply with

5  state rules of evidence is neither a necessary nor a sufficient

6  basis for granting federal habeas relief on due process grounds.

7  See Henry, 197 F.3d at 1031.

8       Petitioner has failed to show that the California Court of

9  Appeal's opinion was an unreasonable application of Supreme Court

10  authority.  There is no clearly established Supreme Court

11  authority that admission of hearsay statements relied on by an

12  expert violates the Confrontation Clause.  See Williams, 132 S.

13  Ct. at 2228; Hill, 588 Fed. App'x at 724.  Moreover, the Supreme

14  Court held in Williams that an expert may render an opinion and

15  explain the facts on which that opinion is based without

16  violating the Confrontation Clause.

17       Even if the trial court did err, the error was harmless.

18  The trial court repeatedly instructed the jury that it could only

19  use the expert's statements to evaluate the expert's opinion, but

20  not to consider the information in the statements to be true.  As

21  described in detail by the state court, there was overwhelming

22  evidence that the crimes were gang related.  If there was an

23  error in admitting the brief statements regarding the gang

24  slogans, the error was harmless.

25       Similarly, Petitioner has not shown that the admission of

26  this evidence resulted in the denial of the fundamentally fair

27  trial guaranteed by due process.  For the same reasons discussed

28  above, if admitting the evidence was an error, it was harmless

United States District Court
Northern District of California

36

1    and Petitioner is not entitled to habeas relief.  This claim is

2    denied.

3                                    E

4         Petitioner also argues that the cumulative effect of the

5    errors alleged above deprived him of a fair trial.

6         The California Court of Appeal denied this claim:

7

8              Defendant contends that the cumulative effect
               of the errors that he has raised on appeal
9              deprived him of a fair trial, "requiring
               reversal of the disputed gang findings."  The
10             California Supreme Court has stated that "a
               series of trial errors, though independently
11             harmless, may in some circumstances rise by
               accretion to the level of reversible and
12             prejudicial error."  (People v. Hill (1998)
               17 Cal.4th 800, 844.)  In this case, we have
13             not found numerous errors by the court or
               counsel.  We have determined that, to the
14             extent there was error in admitting testimony
               by the gang expert concerning gang slogans
15             being uttered, the error was harmless beyond
               a reasonable doubt.  We have also determined
16             that instructional error as to the issue of a
               threat in connection with the attempted
17             dissuasion counts warrants reversal of the
               judgment as to the true finding on the gang
18             allegation for count 1, attempting to
               dissuade Rosa, only.  Defendant fails to
19             demonstrate, and we do not believe, that the
               cumulative error doctrine warrants reversal
20             in this case as defendant was not deprived a
               fair trial.  (See id., at pp. 844-847)

21   Lopez, 2012 WL 1264451, at *24.

22        In some cases, although no single trial error is

23   sufficiently prejudicial to warrant reversal, the cumulative

24   effect of several errors may still prejudice a defendant so much

25   that his conviction must be overturned.  See Alcala v. Woodford,

26   334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where

27   multiple constitutional errors hindered defendant's efforts to

28   challenge every important element of proof offered by

United States District Court
Northern District of California

prosecution); Thomas v. Hubbard, 273 F.3d 1164, 1179-81 (9th Cir. 2002), overruled on other grounds by Payton v. Woodford, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (reversing conviction based on cumulative prejudicial effect of (a) admission of triple hearsay statement providing only evidence that defendant had motive and access to murder weapon; (b) prosecutorial misconduct in disclosing to the jury that defendant had committed prior crime with use of firearm; and (c) truncation of defense cross-examination of police officer, which prevented defense from adducing evidence that someone else may have committed the crime and evidence casting doubt on credibility of main prosecution witness).

Cumulative error is more likely to be found prejudicial when the government's case is weak.  See, e.g., Thomas, 273 F.3d. at 1180 (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime).  However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  See Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011).  Similarly, there can be no cumulative error when there has not been more than one error.  United States v. Solorio, 669 F.3d 943, 956 (9th Cir. 2012).

The state court's opinion was not unreasonable.  While the state court found an error and reversed one of the life-term gang enhancements, Petitioner has not shown that this error combined with other alleged errors raised in this petition cumulatively prejudiced him to warrant habeas relief.  As noted in the claims

1  above, even if errors were made, they were harmless, and

2  cumulatively, they remain harmless.  Moreover, there was

3  overwhelming evidence of Petitioner's guilt for the underlying

4  counts and the remaining gang enhancements.  This claim is

5  denied.

6                              V

7      For the foregoing reasons, the petition for a writ of habeas

8  corpus is DENIED.

9      Further, a Certificate of Appealability is DENIED.  <u>See</u> Rule

10  11(a) of the Rules Governing Section 2254 Cases.  Petitioner has

11  not made "a substantial showing of the denial of a constitutional

12  right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated

13  that "reasonable jurists would find the district court's

14  assessment of the constitutional claims debatable or wrong."

15  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may not

16  appeal the denial of a Certificate of Appealability in this Court

17  but may seek a certificate from the Court of Appeals for the

18  Ninth Circuit under Rule 22 of the Federal Rules of Appellate

19  Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254

20  Cases.

21      The Clerk is directed to enter Judgment in favor of

22  Respondent and against Petitioner, terminate any pending motions

23  as moot and close the file.

24      IT IS SO ORDERED.

25  Dated: 08/12/2015

26

27                              THELTON E. HENDERSON
                                United States District Judge

28  G:\PRO-SE\TEH\HC.13\Lopez4879.hc.docx

United States District Court
Northern District of California